**Frederick M. LUNDQUIST,
Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 85A02–0410–CR–841.**

Court of Appeals of Indiana.

Sept. 30, 2005.

Lisa M. Dirig, Fort Wayne, for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

MATHIAS, Judge.

Frederick Michael Lundquist ("Lundquist") was convicted in Wabash Circuit Court of Class D felony possession of marijuana, and he admitted to being an habitual substance offender. He raises four issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion when it denied Lundquist's motion to continue the trial due to pretrial publicity;

II. Whether the trial court properly admitted the marijuana seized during the search of Lundquist's property; and,

III. Whether the trial court abused its discretion when it admitted testimony concerning marijuana found in Lundquist's home.

Concluding that the trial court did not abuse its discretion when it denied Lundquist's motion for a continuance, admitted the marijuana seized during the search of his property and admitted the testimony concerning the marijuana found in his home, we affirm.

### Facts and Procedural History

Lundquist resides in Wabash County on property owned by his mother, Dorothy Lundquist ("Dorothy").[1] Dorothy's own residence is adjacent to Lundquist's. On June 4, 2003, Lundquist, Dorothy, and his sister, Jody Bright ("Jody"), were involved in an altercation that resulted in Dorothy calling 911. Wabash County Sheriff's Deputies Bryan Cox ("Deputy Cox") and Jonathan Pace ("Deputy Pace") received a 911 dispatch stating that Lundquist was intoxicated and causing a disturbance at Dorothy's residence.

Lundquist left Dorothy's residence before the deputies arrived. Dorothy told

---

1. Dorothy refers to herself by her nickname "Jody." Because Dorothy's daughter, who is also named Jody, was involved in the events that took place on June 4, 2003, we refer to Dorothy by her given name.

the deputies that Lundquist was intoxicated and "tearin' things up." Tr. p. 279. Jody stated that Lundquist knocked her down onto the ground. Tr. p. 228. The deputies did not observe any marks on Jody, and neither Dorothy nor Jody wished to press charges. However, Jody told Deputy Pace that they should hurry back to Dorothy's house if another 911 call was placed. Tr. p. 280. Deputy Pace stated that they would return if needed. Id. Jody replied, "No, I'm serious. If you get called back out here, you better get here quick." Id.

Approximately ten to fifteen minutes later a second 911 call was placed from a caller in Ft. Wayne.[2] When the deputies returned to Dorothy's residence, Dorothy asked why they were there because she had not called for assistance. Tr. pp. 229, 281. The deputies explained that they had received a second 911 call from a caller in Ft. Wayne. Jody told Deputy Pace that Lundquist had been back and "it's still goin' on." Tr. p. 281. The deputies decided that they should not leave until they had found Lundquist and talked to him. Tr. pp. 230, 282.

Deputy Pace moved his vehicle to the end of Lundquist's driveway, walked up the driveway, and knocked on the front door. Tr. p. 282. At the same time, Deputy Cox proceeded towards Lundquist's house by walking over a gravel driveway connecting Dorothy's and Lundquist's driveways. However, Deputy Cox left the gravel driveway as he approached Lundquist's house and proceeded to walk along a tree line on the property towards the back door of the residence. Deputy Cox believed that Lundquist was likely in the woods adjacent to his house because Lundquist had run into the woods on prior occasions when the police were called to his residence. Tr. p. 232. In addition, Dorothy was yelling into the woods asking Lundquist to come out and talk to the deputies. Id. However, Dorothy also told Deputy Cox several times that she wanted him to leave. Id.

While Deputy Pace was knocking on the front door, Deputy Cox was looking into the house through the sliding glass back door to see if there was any movement in the house. Tr. p. 233. Deputy Cox then turned to look into the woods and observed a clay planter situated on the tree line containing a cactus and a plant that appeared to be marijuana. Tr. p. 233.

When no one answered his knock on the front door, Deputy Pace proceeded around the side of the house to look into the woods in an attempt to locate Lundquist. Towards the back of the house, Deputy Pace noticed a patch of weeds, and in that weeded area, he saw several plants that he believed were marijuana. Tr. pp. 283–84. Deputy Pace called out Deputy Cox's name to get his attention. Deputy Cox saw the plants near Pace and also believed that they were marijuana. Tr. pp. 235, 283.

Eventually, Deputy Cox located Lundquist who was hiding in the woods. Tr. pp. 236, 286. Lundquist appeared to be intoxicated and had a large knife in a leather sheath on his right side. Lundquist continually put his hands in his pockets even though he was told not to do so. Tr. pp. 236, 286–87. Because Lundquist was uncooperative and attempted to walk back into the woods, Deputy Cox handcuffed him and placed him in Deputy Pace's squad car.[3] Tr. pp. 237–38, 288.

---

**2.** Jody was on the phone with Dorothy's friend, Charlotte Brown, who resides in Ft. Wayne. During the phone call, Lundquist returned to Dorothy's residence and began to cause another disturbance. After Jody indicated that the police were needed, Brown called 911. Tr. pp. 401, 416.

**3.** Deputy Cox testified that he felt it was necessary to place Lundquist in handcuffs for officer safety. Tr. p. 238.

He was later transported to the Wabash County Jail while Deputies Cox and Pace remained on the property to secure the scene.

After the deputies obtained a search warrant, they searched the property and discovered approximately 300 marijuana plants. Tr. p. 292. Most of the plants were growing from the ground but a few were growing in planters scattered around the property. The deputies collected the marijuana, stripped the leaves from the stalks, and submitted the leaves to the State Police Laboratory for chemical testing. Analysis of the leaves revealed that the plant material was marijuana with a weight of 182 grams. Tr. p. 359; Ex. Vol., State's Ex. 14.

On June 9, 2003, Lundquist was charged with Class D felony possession of marijuana. The State filed an additional charging information on January 14, 2004, alleging that Lundquist was an habitual substance offender. On July 28, 2004, Lundquist moved to suppress all evidence of the marijuana found on his property. A hearing was held on the motion, and it was denied on August 25, 2004. A jury trial commenced on August 26, 2004. The jury found Lundquist guilty of Class D felony possession of marijuana and Lundquist pled guilty to being an habitual substance offender. He was sentenced to serve three years for the marijuana conviction and his sentence was enhanced by eight years due to his habitual substance offender status. Lundquist now appeals. Additional facts will be provided as necessary.

## I. Motion to Continue

 A ruling on a non-statutory motion for a continuance [4] is committed to the sound discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice. *Watson v. State*, 776 N.E.2d 914, 920 (Ind.Ct. App.2002); *see also Carter v. State*, 686 N.E.2d 1254, 1261 (Ind.1997) ("There must be a clear demonstration of an abuse of that discretion, [ ] and the record must show that the accused was prejudiced."). An abuse of discretion occurs where the court's decision is clearly against the logic and effect of the facts and circumstances. *Watson*, 776 N.E.2d at 920.

During the week leading up to Lundquist's trial, articles appearing in a local newspaper discussed the charges filed in this case and allegations that Lundquist was involved in a shooting. Therefore, the day prior to trial, Lundquist moved to continue the trial arguing that such publicity had "tainted this jury pool to such an extent that at this time Mr. Lundquist would not be able to get a fair trial." Tr. p. 122.

In addressing whether Lundquist's motion for continuance should be granted, the trial court stated:

I'm sensitive to the arguments that are being made, but we do have our jury here. I think if we develop on any of the examination of the jury pool, if it develops that they cannot be fair. That they cannot set aside prejudice, if they have any. If they have read the articles and formed an opinion then certainly at that point I think the motion would be well founded and I would grant. If however, it appears that they either have not read or not aware of, or believe that they can be fair, I think that the Motion would not be well founded.... So I think we would be okay on the preliminary examination, to make that determi-

---

4. Indiana Code section 35–36–7–1 establishes certain procedures a defendant must comply with when a motion for a continuance is filed because of 1) the absence of evidence, 2) the absence of a witness, or 3) the illness of the defendant. *See* Ind.Code § 35–36–7–1 (2004).

nation after hearing what they had to say about it.

Tr. p. 126.

██ Lundquist concedes that those jurors who indicated during voir dire that they had heard of or read the news coverage also indicated that they were not biased by that pretrial publicity. *See* Br. of Appellant at 25. Moreover, Lundquist accepted the jury without objection and did not renew his motion for a continuance. Accordingly, we conclude that Lundquist has not established prejudice, and the trial court acted within its discretion when it denied his motion for continuance.

## II. Search of the Property

██ Lundquist originally challenged the admission of the marijuana through a motion to suppress, but appeals following a completed trial challenging its admission at trial. "Thus, the issue is ... appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial." *Washington v. State*, 784 N.E.2d 584, 587 (Ind.Ct.App.2003). Our standard of review of rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pretrial motion to suppress or by trial objection. *Ackerman v. State*, 774 N.E.2d 970, 974–75 (Ind.Ct.App.2002), *trans. denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind.Ct.App. 2005), *trans. denied.* However, we must also consider the uncontested evidence favorable to the defendant. *Id.*

At trial, Lundquist failed to object to 1) testimony concerning the deputies' discovery, search, and collection of the marijuana, and 2) the State Police Chemist's testimony that the plant material collected by the deputies was marijuana with a weight of 182 grams. The only objection Lund-

quist raised was to the admission of the actual marijuana. Tr. p. 369.

██ Even where a defendant moves to suppress evidence prior to trial, he must reassert his objection at trial contemporaneously with the introduction of the evidence to preserve the error for appeal. *See Carter v. State*, 754 N.E.2d 877, 881 n. 8 (Ind.2001). Moreover, to preserve a challenge to the admission of evidence, the defendant must object each time the evidence is offered. *Jenkins v. State*, 627 N.E.2d 789, 797 (Ind.1993). Lundquist has therefore waived appellate review of this issue.

Waiver notwithstanding, Lundquist contends that Deputies Pace and Cox illegally searched his property without a warrant in violation of the Fourth Amendment and Article I, Section 11, and therefore, the search warrant subsequently obtained was invalid. Lundquist also asserts that the search warrant was not supported by probable cause because the probable cause affidavit contained "false and/or knowingly misleading information." *See* Br. of Appellant at 18.

### A. *Lundquist's Fourth Amendment Claim*

The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *VanWinkle v. State*, 764 N.E.2d 258, 263 (Ind.Ct.App.2002), *trans. denied* (quoting *Oliver v. U.S.*, 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). " 'An individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.' " *Shultz v. State*, 742 N.E.2d 961, 964 (Ind. Ct.App.2001), *trans. denied* (quoting *Oliver*, 466 U.S. at 178, 104 S.Ct. 1735). The area immediately surrounding one's home is known as "curtilage," a term derived

from Medieval Latin for court or yard. Oxford English Dictionary (J.A. Simpson & E.S.C. Weiner eds.) (2d ed.1989). Historically, the curtilage of one's home has been considered within the purview of the Fourth Amendment and therefore protected from unreasonable searches and seizures. "The United States Supreme Court has explained the protection afforded the curtilage as one of 'family and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most high.'" *Rook v. State,* 679 N.E.2d 997, 999–1000 (Ind.Ct.App.1997) (quoting *California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)).

■ When police enter onto private property in order to conduct an investigation or for another legitimate purpose and restrict their entry to places that other visitors would be expected to go, such as walkways, driveways, or porches, any observation made from these areas is permissible under the Fourth Amendment. *Shultz,* 742 N.E.2d at 964. "Accordingly, an individual does not have a reasonable expectation of privacy with regard to things or activities within a residence that may be observed by persons using their natural senses from places impliedly open to a visitor's entry." *Divello v. State,* 782 N.E.2d 433, 437 (Ind.Ct.App.2003), *trans. denied* (citation omitted). Therefore, "if police utilize 'normal means of access to and egress from the house' for some legitimate purpose, such as to make inquiries of the occupant ..., it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling." *Id.* (citations omitted).

Lundquist contends that the facts of this case are analogous to those in *Divello.* In *Divello,* investigation of an anonymous tip concerning the cultivation of marijuana justified the police officers' initial entry onto Divello's property. 782 N.E.2d at 437–38. However, after there was no response to the officers' knocks on the front and back doors of Divello's residence, the officers improperly crossed through the backyard of the residence and through a privacy gate to an adjacent property owned by Divello. *Id.* at 438–39. At that property, the officers left the driveway and walkways and invaded the curtilage of the property when they approached the southwest corner of the house to investigate an odor emanating from that area of the house. *Id.* at 439. We concluded that Divello "had a reasonable expectation of privacy in this area," and therefore, the officers' actions violated the Fourth Amendment. *Id.* Moreover, we stated that when the officers failed to receive a response at the second property, "they were no longer there for a legitimate investigatory purpose and should have left." *Id.*

■ We are unpersuaded by Lundquist's reliance on *Divello.* In this case, Deputies Cox and Pace were present on the Lundquist property because two 911 calls had been placed alleging that Lundquist was causing a domestic disturbance. During the response to the first 911 call, Dorothy stated that Lundquist was intoxicated and "tearin' things up." Tr. p. 279. Jody told the deputies that Lundquist knocked her down onto the ground. Tr. p. 228. She also stated, "If you get called back out here, you better get here quick." Tr. p. 280. While we acknowledge that Dorothy, the actual owner of the property, asked the officers to leave during their response to the second 911 call, Jody told Deputy Pace that Lundquist had been back and "it's still goin' on." Tr. p. 281. Therefore, the deputies decided that they needed to find Lundquist and speak to him.

The deputies proceeded first to Lundquist's house to determine whether Lund-

quist was in the house. Deputy Pace initially restricted his movements to the driveway and walkway as he approached the front door. Receiving no response, Deputy Pace walked around the side of the house to see if Lundquist was in the wooded area next to the residence. Tr. p. 283. At that point, Deputy Pace noticed the plants that appeared to be marijuana growing near the house. Although Deputy Pace invaded the curtilage of Lundquist's residence, his intention in doing so was not to search for marijuana, but merely to find Lundquist. Moreover, the deputies reasonably believed Lundquist was hiding on the property.[5]

Similarly, although he initially restricted his movements to the driveways on the property, Deputy Cox may have also invaded the curtilage of Lundquist's property when he left the driveway to walk along the tree line as he approached the back door of Lundquist's residence. Deputy Cox's intention was to look through the sliding glass door to observe "any kind of movement in the house" while Deputy Pace was knocking on the front door. Tr. p. 233. As Deputy Cox turned from the back door to look into the woods, he saw a planter containing a cactus and a plant that appeared to be marijuana. Like Deputy Pace, Deputy Cox's intent was not to search for contraband, but merely to locate Lundquist so that the deputies could speak to him about the disturbances he had caused on the property that evening.

Unlike the facts and circumstances presented in *Divello*, in this case, the deputies were not investigating an anonymous tip, but responding to two 911 calls concerning a domestic disturbance. Moreover, the deputies reasonably believed that Lund-

quist was hiding on the property. Therefore, the deputies had a legitimate reason for remaining on the property after Deputy Pace's knock on the front door failed to elicit a response. Because Lundquist was likely hiding on the property, the deputies legitimately invaded the curtilage of his property in an attempt to find him. Accordingly, under these unique circumstances, we conclude that the deputies' observation of marijuana in plain view while they were attempting to locate Lundquist does not constitute a constitutionally impermissible search under the Fourth Amendment.

### B. *Article I, Section 11*

Lundquist also challenges the search of his property under the Indiana Constitution. Article I, Section 11 provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

The purpose of Article I, Section 11 is to protect from unreasonable police activity those areas of life that Hoosiers regard as private. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind.2001); *State v. Moore*, 796 N.E.2d 764, 767 (Ind.Ct.App.2003), *trans. denied.*

▆▆▆▆ Analysis under Article I, Section 11 requires examination of the specific facts of each case and whether police conduct is reasonable in light of the totality of the circumstances. *Scott v. State*, 803 N.E.2d 1231, 1236 (Ind.Ct.App.2004).

---

5. The deputies were aware of Lundquist's tendency to run into the woods when law enforcement officers were called to his residence. *See* Tr. p. 232. Moreover, the deputies' belief that Lundquist was possibly in the woods adjacent to his residence was bolstered by the fact that Dorothy was yelling into the woods telling Lundquist to come out. *Id.*

Each case must be considered upon its own facts to decide if the police behavior was reasonable. *Mitchell,* 745 N.E.2d at 786. Section 11 " 'must receive a liberal construction in its application to guarantee the people against unreasonable search and seizure.' " *Id.* (quoting *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995)). The State bears the burden of proving that the search was reasonable under the totality of the circumstances. *Id.*

During their response to the first 911 call, Deputies Pace and Cox were told that Lundquist was intoxicated, "tearin' things up," and that he had physically attacked his sister, Jody. Tr. pp. 228, 279. At the end of their response to the first call, Jody stated, "If you get called back out here, you better get here quick." Tr. p. 280. After the second 911 call, acting under the reasonable belief that Lundquist was hiding on the property, the deputies began to search for Lundquist so that they could speak with him. During their search for Lundquist, the deputies saw marijuana in plain view. Under the totality of the circumstances, we conclude that the deputies' conduct was reasonable. Therefore, their discovery of the marijuana during their search for Lundquist does not violate Article I, Section 11 of the Indiana Constitution.

## C. *Probable Cause*

After Deputies Cox and Pace observed what they believed to be marijuana on Lundquist's property, they obtained a search warrant. Lundquist claims the search warrant was not based on probable cause because the "affidavit of probable cause consisted primarily of false and/or knowingly misleading information." Br. of Appellant at 18.

Both the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Indiana Constitution demand that no search warrant be issued unless it is supported by probable cause. "Probable cause is 'a fluid concept incapable of precise definition ... [that] is to be decided based on the facts of each case.' " *Creekmore v. State,* 800 N.E.2d 230, 233 (Ind.Ct.App.2003) (quoting *Figert v. State,* 686 N.E.2d 827, 830 (Ind.1997)).

In deciding whether to issue a search warrant, " '[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Query v. State,* 745 N.E.2d 769, 771 (Ind.2001) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The duty of the reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. *Id.* The "substantial basis" determination requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Houser v. State,* 678 N.E.2d 95, 99 (Ind.1997). A "reviewing court" for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision. *Id.* at 98. " 'An affidavit demonstrates probable cause to search premises if it provides a sufficient basis of fact to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime.' " *Bowles v. State,* 820 N.E.2d 739, 748 (Ind. Ct.App.2005), *trans. denied* (quoting *Utley v. State,* 589 N.E.2d 232, 236 (Ind.1992)).

A probable cause affidavit must meet the criteria established in Indiana Code section 35–33–5–2.

(a) ... [N]o warrant for search or arrest shall be issued until there is filed with the judge an affidavit:

(1) particularly describing:

(A) the house or place to be searched and the things to be searched for; or

(B) particularly describing the person to be arrested;

(2) alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

(A) the things as are to be searched for are there concealed; or

(B) the person to be arrested committed the offense; and

(3) setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause.

(b) When based on hearsay, the affidavit must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

Ind.Code § 35–33–5–2 (2004).

Finally, we observe, "where a presumption of the validity of the search warrant exists, the burden is upon the defendant to overturn that presumption." *Jones v. State*, 783 N.E.2d 1132 (Ind.2003).

If a defendant establishes by a preponderance of the evidence that "a false statement knowingly and intentionally, or with a reckless disregard for the truth, was included by the affiant in the warrant affidavit, ... and, with the affidavit's false material set to one side, the affidavit's remaining content is insuffi-

cient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

*Stephenson v. State*, 796 N.E.2d 811, 815 (Ind.Ct.App.2003), *trans. denied* (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

■ In this case, the probable cause affidavit, executed by Detective Mike Shrider, provides in pertinent part:

On 6–4–03 I was contacted at home by dispatch and advised that Deputy Jon Pace was requesting my assistance at the ... Lundquist [ ] residence located at 5173 E Co Rd 50 South. I called Deputy Pace on the cell phone and he advised me of the following facts:

Deputy [P]ace was dispatched to this location on two occasions within a one hour period. The complaints came from Mike's mother Jody Lundquist and his sister, also named Jody. The complaints stated that Mike was out of control, intoxicated and destroying property.

That on the first response Mike fled into the woods at the residence. And that on the second response, due to Mikes [sic] actions with officers he had to be placed into custody for disorderly conduct.

That while on this call for service, Deputy Pace found what he knew to be marijuana plants growing outside the house. Deputy Pace estimated the number of plants to be at least 100. Deputy Pace advised that some of the plants were planted in the ground while others were still in pots.

Deputy Pace also stated to this officer that he had seen in plain view inside the house and near the glass front door of the residence a substance he recognized as being psylocyben [sic] mushrooms.

Due to the fact that some of the plants are in pots it is possible that they had been transferred from the home.

Ex. Vol., State's Ex. 2.

Lundquist argues that several statements in the affidavit are false or misleading, including: 1) the deputies were not dispatched to his residence, but to Dorothy's, 2) the second 911 call was not placed by Dorothy, but by a caller in Ft. Wayne, 3) Lundquist did not commit the offense of disorderly conduct, 4) Deputy Pace never stated that he saw psilocybin mushrooms through the glass door, and 5) the use of the term "pots" implies an indoor planter, but the "pots" were "clearly outdoor garden containers." Br. of Appellant at 18–19. Lundquist also asserts that "there is not [sic] statement in compliance with Ind. Code § 35–33–5–2 as to the credibility of the hearsay contained in the affidavit." Br. of Appellant at 20.

"Mistakes and inaccuracies in search warrant affidavits will not 'vitiate the reliability of the affidavits so long as such mistakes were innocently made.'" *Mitchell*, 745 N.E.2d at 785 (quoting *Utley*, 589 N.E.2d at 236–37). "The party alleging that the mistakes were not innocent must make a substantial showing that the facts were included in reckless disregard for the truth." *Id.* (citing *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674). Lundquist has not made a "substantial showing" that the inaccurate statements in the affidavit were "included in reckless disregard for the truth." Moreover, with one exception, those inaccuracies are minor and have no effect on the validity of the affidavit and subsequent issue of the search warrant.

Deputy Pace's statement about the mushrooms does present some concern. Deputy Pace testified that he saw mushrooms drying on a table, but did not identi-

fy them as psilocybin mushrooms, and that he does not have "any particular familiarity" with illegal mushrooms. Tr. p. 85. Detective Shrider stated that he included that statement in the affidavit because Deputy Pace used the term "shrooms" in describing the mushrooms on the table. Detective Shrider therefore believed that in using the term "shrooms," Deputy Pace was referring to illegal mushrooms.[6] Tr. p. 343. Although Detective Shrider should have clarified whether Deputy Pace believed the mushrooms to be illegal, the inclusion of that statement in the affidavit does not amount to a reckless disregard for the truth.

■■■ Finally, the affidavit describes Deputy Pace's personal observation of numerous marijuana plants growing near Lundquist's residence. The presence of those marijuana plants on the property would certainly "permit a reasonably prudent person to believe that a search of those premises will uncover [further] evidence of a crime." *See Bowles*, 820 N.E.2d at 748. Accordingly, we conclude that the search warrant was supported by probable cause, and for all of the reasons discussed above, the trial court acted within its discretion when it admitted into evidence the marijuana seized during the search of Lundquist's property.

### III. Testimony Concerning the Marijuana Found in Lundquist's Home

■■■ Finally, Lundquist argues that the trial court abused its discretion when it allowed Deputy Pace to testify that he found remnants of marijuana cigarettes inside Lundquist's home. "The evidentiary rulings of a trial court are afforded great deference and are reversed on appeal only upon a showing of an abuse of

---

**6.** The mushrooms on the table were morel mushrooms, and therefore, the mushrooms were not seized during the search. Tr. p. 343–44.

discretion." *Reynolds v. State,* 797 N.E.2d 864, 867 (Ind.Ct.App.2003). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Pickens v. State,* 764 N.E.2d 295, 297 (Ind.Ct.App. 2002), *trans. denied.*

Prior to trial, the trial court granted Lundquist's motion in limine excluding evidence of four hand-rolled, partially burnt marijuana cigarettes found during the search of Lundquist's residence. During cross-examination of Deputy Pace, Lundquist's attorney elicited testimony that Lundquist's residence was searched and no fertilizer, packaging material, scales, grow lights, or large sums of money were found. Tr. pp. 311–12. The State then argued that Lundquist's counsel had "opened the door" to inquiry concerning the marijuana cigarette remnants found inside the home. Tr. p. 313. The court agreed and allowed Deputy Pace to testify that he found "four partially burnt hand rolled cigarettes" on a table near the front door. Tr. pp. 315–16. Due to the smell of the cigarettes, Deputy Pace believed they contained marijuana. Tr. p. 316. A field test resulted in a positive result for marijuana, but the cigarettes were not submitted for testing at the State Laboratory. Tr. pp. 316–19.

"Otherwise inadmissible evidence may become admissible where the defendant 'opens the door' to questioning on that evidence." *Crafton v. State,* 821 N.E.2d 907, 910 (Ind.Ct.App.2005) (citing *Jackson v. State,* 728 N.E.2d 147, 152 (Ind.2000)). "However, the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Id.* at 910–11 (quoting *Jackson,* 728 N.E.2d at 152). Lundquist contends that his questioning of Deputy

Pace was directed towards whether the deputies found any items during their search tending to establish that Lundquist had deliberately cultivated the marijuana, and therefore, the discovery of four marijuana cigarettes inside his home was not relevant to that line of questioning. Br. of Appellant at 24.

■ However, as the State notes in its brief, such questioning of Deputy Pace could have created the false impression with the jury that no incriminating evidence was discovered in Lundquist's home. Br. of Appellee at 26. Accordingly, we conclude that Deputy Pace's testimony concerning the marijuana cigarettes was relevant and admissible to correct any impression that no incriminating evidence was discovered in Lundquist's home.[7]

### Conclusion

The trial court did not abuse its discretion when it denied Lundquist's request for a continuance, and the marijuana seized during the search of Lundquist's property was properly admitted. Finally, the trial court acted within its discretion when it admitted evidence that remnants of four marijuana cigarettes were discovered during the search of Lundquist's home.

Affirmed.

DARDEN, J., and CRONE, J., concur.

---

7. Moreover, we agree with the State's assertion that any error in the admission of Deputy Pace's testimony was harmless. The jury was presented with evidence that over 300 marijuana plants were growing near and in plain view of Lundquist's home; therefore, the evidence of Lundquist's guilt was overwhelming.