

**FILED**

Feb 28 2017, 5:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Chad A. Montgomery
Montgomery Law Office
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ricky Johnson, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | February 28, 2017 <br><br> Court of Appeals Case No. 79A04-1601-CR-165 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Steven P. Meyer, Judge <br><br> Trial Court Cause No. <br> 79D02-1412-F4-5 |

**Brown, Judge.**

[1] Ricky Johnson appeals his conviction for possession of a firearm by a serious violent felon as a level 4 felony. Johnson raises two issues which we consolidate and restate as whether the trial court abused its discretion by admitting evidence obtained pursuant to a protective sweep. We reverse.

*Facts and Procedural History*

[2] On December 7, 2014, Lafayette City Police Officer Lonnie Charles Wilson was dispatched at 5:10 a.m. to 104 Cochise Trail in Tippecanoe County regarding a female, Dmysia Joe, saying someone was trying to kill her with a handgun. Joe called the police again and informed them that she had left and gone to a Burger King restaurant. Officer Wilson then proceeded to the restaurant where he met Joe, a female "about 5 foot 5'2", about 130-140 pounds." Transcript at 108. Joe was very upset and hysterical. She told Officer Wilson that her then-boyfriend, Johnson, had threatened her, was intoxicated, pointed a weapon at her head, cocked the weapon, and said that he would kill her. Officer Wilson transported Joe to the Lafayette Police headquarters where she gave a statement.

[3] Joe told Officer Wilson that she left work around 10:30 p.m. and went to her apartment to find Johnson on the bed drinking. She said Johnson stated that he was going to go on a run with his friend, he left with the friend, she called Johnson repeatedly, and that "the time comes to 3:30" and Johnson finally answered and said he was leaving. State's Exhibit 1 at 6:15. Johnson returned to the apartment intoxicated. She stated that Johnson said: "I'm going to go kill them. They arrested my brother." *Id.* at 6:17. She also said that Johnson

told her to "go get my gun," and that she gave Johnson his revolver. *Id.* at 6:18. She said that Johnson pointed the gun at her and said: "I'm going to kill you bitch." *Id.* at 6:20. She also told the police that Johnson took her vehicle, he was going to hang out with a friend, he typically hangs out with his brothers, one of his brothers was in jail, and that he hangs out with his other brother, Deshawn Johnson. Officer Wilson was familiar with the lengthy criminal history of Deshawn Johnson, and "in law enforcement's view he's a gang member of BTC." Transcript at 29. Joe said that Johnson had made threats to other people and that he wanted to make certain individuals pay for "putting his brother in jail." *Id.* at 30. Joe's recorded statement to the police concluded at 6:24 a.m.

[4]     While Joe was still at police headquarters, Johnson called her cell phone, told her he was home, and demanded to know her location and that she return to the apartment. Officer Wilson told Joe and her mother to go to the Burger King, and he went to the apartment. Other officers went to the residence and heard Johnson yelling and "carrying on through the window." *Id.* at 12. They also discovered Joe's vehicle in the parking lot. The officers were about to set up a tactical blanket[1] based on their understanding that a person was inside and may be armed with a handgun, when Johnson exited the apartment. He had a phone to his ear with one hand, locked the door with a set of keys in his other

---

[1] Lafayette Police Officer Stephen Bittles testified that a tactical blanket is "like a bullet proof blanket, basically a moveable bullet proof wall." Transcript at 147.

hand, began walking toward the police, and then turned to go back into the apartment. He "started to put the keys into the lock to re-open the door" when police stopped him. *Id.* at 14. Johnson stood there for a moment and did not cooperate with police commands, but then he did cooperate without resistance, and officers apprehended him in the common hallway area of the apartment building at approximately 7:15 a.m.

[5] Officer Wilson "made [his] announcements with [his] K-9 asking anybody to come out," and "nobody made any noises inside." *Id.* at 27. While Johnson was taken to a squad car, the police entered the apartment to conduct a protective sweep observed broken glass on the floor, a broken picture frame in the kitchen, and ultimately a handgun on the bed in the back bedroom. The police did not locate anyone inside the apartment. Johnson stated that he wanted to be released, and Lafayette Police Officer Stephen Bittles told him that the police had received a complaint that he took a woman's car and pointed a handgun at her. The police patted Johnson down and did not discover any weapons. Officer Wilson contacted Joe and she came to the scene, and the police went through the apartment with her. Joe told Officer Wilson "there should be any of her – nothing – no weapons would be in her house that were hers or anything like that and she wanted them gone." *Id.* at 19. The police discovered a shoebox containing ammunition near the bed.

[6] On December 8, 2014, Johnson called Joe from the jail and on December 10, 2014, the State charged him with possession of a firearm by a serious violent

felon as a level 4 felony and criminal recklessness as a level 6 felony. In January 2015, the State added the count of intimidation as a level 5 felony.

[7] On November 18, 2015, Johnson filed a motion to suppress evidence alleging that the search violated his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The court held a hearing on the motion the next day. Officer Wilson testified that Johnson turned to go back inside the apartment and: "Then with the information I had, him possibly having a weapon, the fear he might hurt somebody because he had already implicated that he was out to do so, I then felt that we needed to hurry up and make action to keep him from going back inside the building accessing anything I didn't see on him at the time." *Id.* at 13-14. When asked why he entered the apartment, Officer Wilson answered:

> With the statement given by Dmysia that it was her apartment access she had told me that she had a weapon. He had said that he was going to retaliate for those that tried to or did put his brother in jail, and he threatened to kill her. And from what she showed me his actions taken, we then did a protective sweep of that apartment for any persons injured or anything that might have been evidence to an injury of another individual. And we cleared that in safety.

*Id.* at 15. He testified that the police did not enter the apartment to specifically find the handgun. On redirect examination, when asked whether he believed that there were potentially other people inside that could pose a safety threat to him, Officer Wilson testified:

> I do believe from what [Joe] told me there was a definite risk of another individual being harmed by his actions because of what he had told her and she stated to me, his intents as well as how he demonstrated he was going to do harm to her. She also said that he had left earlier in the evening with that individual, and I didn't know if that individual was present inside. So, with the information I had, I wanted to do a protective sweep for any person's safety, but I don't want to put myself in any harm's way if there was a second individual that we did not know about that happened to be with him.

*Id.* at 28. On recross-examination, Officer Wilson testified that he conducted the sweep to protect himself and that nobody was seen or heard. At the end of the hearing, the court stated there was evidence that Johnson acted erratically and violently, that he made threats against Joe and other people, and that there were articulable facts "for officers to have a concern not only for their own safety, but more importantly for safety of anybody that might be in the apartment . . . ." *Id.* at 37. The court denied the motion to suppress as to the firearm, but granted the motion as to the box of ammunition.

[8] The prosecutor moved to dismiss the charges of criminal recklessness and intimidation, and the court granted the motion. At trial, the parties stipulated that Johnson was a person barred from possessing a firearm. When the prosecutor began to elicit testimony from Officer Wilson regarding the protective sweep, Johnson's counsel objected to any testimony or evidence regarding what was acquired in the search, and the court overruled the objection. The court stated that it would not allow any testimony about what was inside the shoebox because that exceeded the scope of the protective sweep.

[9] After the State rested, Joe testified as a defense witness. She testified that she lived with Johnson in apartment 215, that she thought he was cheating on her, and that she was on medication, drinking, and "went crazy." *Id.* at 180. She testified that she called her mother and told her that Johnson put a gun to her head and tried to kill her and that that statement was not correct. She stated that her friend, Dee, and his girlfriend, Krissy, had asked her to hold the gun and that she never told Johnson anything about the gun. She stated that her mother called the police and that she told the police that Johnson had held a gun to her head and tried to kill her, but that was not a correct statement. Joe further testified that she received a jail phone call from Johnson, that she said something to him about his using the gun on her, that it was not a correct statement, and that she made the statement because her mom was sitting right next to her. According to Joe's testimony, she applied for a protective order against Johnson on December 9, 2014, and "said it was a domestic violence." *Id.* at 184. She said that she wrote a letter on December 12, 2014, "to bring out the real truth on what really happened that night," and that she filed a motion to dismiss the protective order on February 11, 2015. *Id.*

[10] On cross-examination, Joe testified that she did not know Dee and Krissy's last names and that the gun was in the shoebox. When asked how the gun was located on the bed and not in the shoebox when officers arrived, Joe answered: "I mean I was drunk I could have laid it on the bed; it was only me in the apartment." *Id.* at 191. She testified that she lied under oath in a deposition a day earlier when she stated that the gun remained under the bed. The

prosecutor asked Joe: "That shoe box only contained the gun, right?" *Id.* at 191. Joe answered affirmatively. Johnson's counsel objected. During a sidebar, the prosecutor stated that the items in the shoebox were previously suppressed as evidence but the exclusionary rule did not apply to impeach a witness, that Joe had testified that the shoebox contained only the gun, and that there was a photo showing ammunition and several magazines in the shoebox, and the prosecutor moved to admit the photo for impeachment purposes. Johnson's counsel stated: "Judge I – I don't have case law, but I'm not going to argue that is [an] incorrect stance for the State. I mean if someone comes in – if evidence is suppressed and someone specifically – the statements are inconsistent I would have to review case law to see, but I think that is probably admissible for impeachment." *Id.* at 193. Johnson's counsel then argued that the photo should be suppressed because "unfair prejudice out weights the appropriate value." *Id.* The court admitted the photo. The prosecutor showed Joe the photo of the shoebox, and Joe testified that the shoebox contained several magazines and ammunition. Joe also testified that she gave a statement to Officer Wilson outside the presence of her mother, that she told him Johnson had demanded she go retrieve the gun which he had kept in a shoebox next to his bed, and that she told him that Johnson pointed the gun at her and said that he would kill her.

[11] The jury found Johnson guilty as charged. The court sentenced Johnson to nine years in the Department of Correction with one year suspended to probation.

## *Discussion*

[12] The issue is whether the trial court abused its discretion by admitting evidence obtained pursuant to the protective sweep. Although Johnson originally challenged the admission of the evidence through a motion to suppress, he now challenges the admission of the evidence at trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence. *See Jefferson v. State*, 891 N.E.2d 77, 80 (Ind. Ct. App. 2008), *trans. denied*; *Lundquist v. State*, 834 N.E.2d 1061, 1067 (Ind. Ct. App. 2005).

[13] We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. In reviewing the trial court's ruling on the admissibility of evidence from an allegedly illegal search, an appellate court does not reweigh the evidence but defers to the trial court's factual determinations unless clearly erroneous, views conflicting evidence most favorably to the ruling, and considers afresh any legal question of the constitutionality of a search or seizure. *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[14]    In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014).

[15]    Johnson argues that the admission of evidence of the gun was improper because the protective sweep of the residence was unreasonable and the officers had a mere inchoate and unparticularized suspicion or hunch. The State asserts that the area searched was immediately adjoining where Johnson was arrested and no probable cause or reasonable suspicion was required to search. The State also argues that to the extent we determine that the location of the arrest precluded a protective sweep unless the officers had reasonable suspicion that someone else could be inside who could pose a safety threat, such circumstances were present here. The State contends that the potential danger to officers from a person hiding in the adjoining areas was the same whether Johnson was arrested in the doorway or the area immediately in front of the doorway, that Officer Wilson could have reasonably suspected that there could be another person, such as Deshawn Johnson, armed and inside the apartment

who could jeopardize the officers' safety, and that a protective sweep was justified.[2]

[16] The Fourth Amendment to the United States Constitution provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *Osborne v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[17] The trial court stated that there were articulable facts for officers to have a concern for their own safety and for the safety of a person that might be in the apartment. The United States Supreme Court and the Indiana Supreme Court have recognized a limited exception to the warrant requirement where an officer reasonably believes a person inside a home may have been in need of aid. *Bryant v. State*, 660 N.E.2d 290, 300-301 (Ind. 1995) (citing *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642 (1967); *Tata v. State*, 486 N.E.2d 1025 (Ind. 1986)), *cert. denied*, 519 U.S. 926, 117 S. Ct. 293 (1996). In

---

[2] In his brief, Johnson mentions Article 1, Section 11 of the Indiana Constitution in his statement of the case and statement of facts and mentions the Indiana Constitution generally in his argument section. However, he fails to provide an independent analysis of the Indiana Constitution. Failure to make a cogent argument under the Indiana Constitution constitutes waiver of the issue on appeal. *See Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002) (holding that because the defendant presented no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived). Thus, we focus on his claim under the United States Constitution.

cases employing this exception, police possessed objective evidence that a violent crime had or was about to occur. *Id.* (citing *Hayden*, 387 U.S. 294, 87 S. Ct. 1642; *Tata*, 486 N.E.2d at 1028).

[18] The United States Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990). As an incident to arrest officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S. Ct. at 1098. A search beyond those parameters is permissible only when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

[19] In *Reed v. State*, this Court addressed a protective sweep that occurred after police pulled the defendant outside the door to the residence and the officers and the defendant fell into the bushes. 582 N.E.2d 826, 827 (Ind. Ct. App. 1991), *reh'g denied*, *trans. denied*, *cert. denied*, 506 U.S. 848, 113 S. Ct. 142 (1992). We observed that federal courts have upheld protective sweeps although the suspect was arrested outside of the premises. *Id.* at 828 (citing in part *United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990) (protective sweep incident to an

arrest outside the home is permissible if reasonable belief exists that another person is inside and aware of arrest since that person may jeopardize the officer's safety); *United States v. Merritt*, 882 F.2d 916 (5th Cir. 1989) (although defendant stepped outside of motel room when surrendering to arrest warrant, officers were justified in making protective sweep because they were aware room was registered to another person which supported a reasonable belief that a search was necessary for their safety), *cert. denied*, 496 U.S. 907, 110 S. Ct. 2592 (1990); *United States v. Akrawi*, 920 F.2d 418 (6th Cir. 1990) (protective sweep of second floor of home was improper where no specific or articulable facts for officers to believe anyone else was inside posing a safety threat); *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989) ("If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another."), *cert. denied*, 498 U.S. 825, 111 S. Ct. 80 (1990)). We held that "a protective sweep incident to an arrest occurring outside the residence may be valid if the police have articulable facts which support a reasonable belief that other persons may be inside the residence which may pose safety threats." *Id.*

[20]   Johnson cites *Smith v. State*, 565 N.E.2d 1059 (Ind. 1991), in which, following his arrest, Wesley Smith informed police officers that there was marijuana in his home and that his wife, Tammy Smith, was in the home alone with two children. 565 N.E.2d at 1060. The police obtained a warrant for Tammy's

arrest, but did not have a search warrant. *Id.* The officers were permitted to enter through the front door by Tammy who was then advised of her rights and arrested. *Id.* The officers then conducted a "protective sweep" of the entire house. *Id.* During this exploration, the officers discovered a locked door to a storage room connected to the game room of the house. *Id.* The officers heard no sounds emanating from the room, nor did they smell any unusual odors. *Id.* The officers discussed the legality of entering the room without a search warrant. A trooper called the prosecuting attorney to discuss the necessity of acquiring a search warrant, and at the same time another officer inserted a paperclip into the doorknob to release the lock and entered the room where marijuana was discovered. *Id.* The trial court held the evidence discovered in plain view after the storage room door was opened admissible. *Id.*

[21]    On appeal, the Indiana Supreme Court addressed whether the warrantless entry into the locked storage room and seizure of the marijuana violated the Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* The Court observed that "[o]f particular relevance here is the alternative requirement under *Buie* either that the area searched was 'immediately adjoining the place of arrest,' or that there existed articulable facts warranting the arresting officers to reasonably believe that 'the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* at 1062. The Court observed that the officers first entered the living room of the home to make the arrest, then checked the separate kitchen and game room, and found the locked door to the storage room off the game room. *Id.* It noted that there was "no indication from the

record that the officers perceived any danger to their safety." *Id.* The Court stated that there was no evidence that the storage room immediately adjoined the place of arrest from which an attack could be immediately launched and there was no specific and articulable facts demonstrating any reasonable suspicion of danger. *Id.* at 1063.

[22] Similar to *Smith*, we address whether the bedroom in which the gun was discovered was a space immediately adjoining the place of arrest from which an attack could be immediately launched, or if this was a search beyond those parameters requiring "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S. Ct. at 1098. Officer Wilson referred to the bedroom in which the gun was found as a "back bedroom." Transcript at 113. Officer Brown testified that "[t]here's a living room area beside the front door, there's a kitchen area off to the left and then when you proceed back you have the bedroom off to the south east and then a bedroom." *Id.* at 145. Officer Wilson testified that the handgun was found on the edge of the bed, that State's Exhibit 2 was a photograph showing "the living room and kitchen and dining room off to the left as you would open the door and enter the apartment," and that State's Exhibit 3, a photograph showing the gun on the bed, showed "that door that you would see going into the bedroom from Exhibit 2, you would turn and look into the bedroom from this corner." Transcript at 17-18. Based upon the record, we cannot say that the State

demonstrated that the back bedroom behind the locked door of the apartment was a space immediately adjoining the place of arrest in the hallway of the apartment building from which an attack could be immediately launched.[3] Thus, we turn to whether articulable facts existed which when taken together with the rational inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

[23] The officers arrested Johnson outside of the apartment in a common hallway area of the apartment building. Thus, the person who had threatened Joe was in custody. The door to the apartment was closed and locked at the time of the arrest. There is no evidence that the officers saw or heard anyone else in the apartment. When Officer Wilson "made [his] announcements with [his] K-9 asking anybody to come out," "nobody made any noises inside." *Id.* at 27. During recross-examination, defense counsel asked Officer Wilson: "But at the sweep, the time of the sweep when you elected to go inside, you had no specific reason to believe – there was no specific indication that Deshawn or anyone else was in the apartment?" *Id.* at 31. Officer Wilson answered: "I had heard nobody or saw nobody." *Id.* As in *Smith* where the subject of the arrest warrant was arrested and the officers subsequently heard no sounds emanating

---

[3] To the extent the State cites *State v. Manuel*, 270 P.3d 828 (Ariz. 2011), we find that case distinguishable. In *Manuel*, the Supreme Court of Arizona found that the search of a hotel room was justified under the first *Buie* exception where, while the police were completing the arrest in the hallway outside the room, the defendant's girlfriend came to the doorway, screaming hysterically, and the hotel room was immediately adjacent to the place where the defendant was arrested and his girlfriend was detained. 270 P.3d at 832.

from the locked room, and in which the Indiana Supreme Court observed that there was no indication that the officers perceived any danger to their safety, likewise there is no indication here that the officers perceived any danger to their safety or to any possible victim inside the apartment.

[24] To the extent the State argues that *Reed* requires that we affirm, we disagree. In *Reed*, we held that the detectives did show articulable facts to justify the protective sweep where: the detectives were aware that the house they surrounded belonged to the defendant's girlfriend; after the detectives knocked on the door and announced themselves, one officer heard the toilet flush and several officers heard running or scuffling sounds; and as officers were restraining the defendant, a woman's voice answered a detective's inquiry as to whether anyone else was inside, but she did not exit the house. 582 N.E.2d at 828. These articulable facts are not present in this case and thus we find *Reed* distinguishable.

## Conclusion

[25] We conclude that the protective sweep was improper and that the trial court abused its discretion by admitting the gun discovered in the apartment.[4] For the foregoing reasons, we reverse Johnson's conviction.

---

[4] We note that the State does not argue that the inevitable discovery or independent source exceptions apply.

Reversed.

Robb, J., and Mathias, J., concur.