Charles Adam **TROTTER**, Appellant– Defendant/Cross–Appellee,

v.

**STATE** of Indiana, Appellee– Plaintiff/Cross– Appellant.

No. 29A02–0910–CR–974.

Court of Appeals of Indiana.

Sept. 10, 2010.

Rodney T. Sarkovics, Campbell Kyle Proffit LLP, Carmel, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Charles Adam Trotter brings this interlocutory appeal from the trial court's denial of his motion to suppress evidence regarding observations of police officers obtained upon their warrantless entry into a private residence. The trial court concluded that, although the warrantless entry was unlawful pursuant to both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, evidence of the officers' observations is nevertheless admissible pursuant to the doctrine of attenuation. By way of cross-appeal, the State challenges the trial court's threshold determination that police officers unlawfully entered the private dwelling. We reverse and remand.

### Issues

Both Trotter and the State raise issues for our review, which we reframe as follows:

I. Whether the warrantless entry into a private residence violated the Fourth Amendment to the United States Constitution and Article 1,

Section 11, of the Indiana Constitution; and

II. Whether evidence of the officers' observations obtained as a result of the warrantless entry is admissible pursuant to the doctrine of attenuation.

### Facts and Procedural History

On April 4, 2009, at approximately 11:46 p.m., Carmel Police Officer David Henry responded to a complaint of gunshots fired in a backyard near 146th Street and Towne Road. After arriving in the area, Officer Henry heard what he believed to be shotgun fire coming from the north in Westfield. As Officer Henry proceeded toward 151st Street to investigate the source of the gunfire, he requested that dispatch notify the Westfield Police Department.

Officer Henry noticed in the distance a campfire at the location where he believed the shots may have been fired. Officer Henry proceeded up a gravel driveway to a one-story home with a large attached pole barn. The campfire was just north of the home beyond a small tree line. Officer Henry activated his police vehicle's rear deck red and blue emergency lights to alert the responding Westfield police officers. Officer Henry then exited his vehicle and approached an individual who was sitting in a lawn chair by the campfire. The individual, identified as Barry Dircks, stood up as Officer Henry approached. Dircks informed Officer Henry that his cousin, Trotter, was inside the residence using the bathroom. On a picnic table next to the campfire, Officer Henry observed a .45 caliber handgun, ammunition for that gun, as well as shotgun shell boxes. A gallon bottle of hard liquor was sitting on the picnic table, and Dircks was holding a plastic cup.

Officer Henry asked Dircks if he had been "shooting off any rounds," and Dircks responded that he had not. Tr. at 15–16. Officer Henry assured Dircks, "I'm not going to try to hem you up over this," but informed him that the home was close to residential areas and that shooting off rounds was not safe. Tr. at 16. Dircks then apologized and explained that he and Trotter were just having some fun. Dircks showed Officer Henry two AR–15 magazines from another weapon he had been using. Officer Henry suggested that he and Dircks go talk to Trotter. As the pair was about to do so, additional Carmel and Westfield police officers arrived at the scene. Officer Henry explained the situation to the responding officers and turned over his investigation to Officer Broc Larrison and Officer Jeremy Butterfield of the Westfield Police Department.

In addition to noticing the firearm and ammunition on the table, Officers Larrison and Butterfield noticed shell casings on the ground and a propane tank that appeared to have recently been shot. The Westfield officers spoke to Dircks but believed that he may have been intoxicated and was behaving somewhat belligerent. The officers placed Dircks in handcuffs and began to look for Trotter. Officer Larrison checked doors on the east side of the residence and the pole barn and discovered that those entrances were locked. Officer Larrison also looked into the windows of a recreational vehicle on the property but determined that nobody was inside. Officer Larrison then discovered that a door on the southeast corner of the pole barn was unlocked. Officer Larrison informed Officer Butterfield that he had located an unlocked door, and the officers decided to go in.

Officer Butterfield opened the door and announced that they were officers with the Westfield Police Department. Although

Officer Larrison testified that he knocked on the doors when he originally checked them, Officer Butterfield, who was the first to enter through the unlocked door, did not knock on the door prior to opening it. Once inside, the officers shined their flashlights around the dark pole barn. The officers heard a rustling sound and again announced that they were police officers. They heard no response. However, after shining their flashlights in the direction of the noise, the officers observed Trotter approximately fifteen feet away from them standing behind some construction equipment with a rifle pointed at them. Trotter exclaimed something along the lines of, "You don't need to be here. Get out." *Id.* at 43. The officers ran out of the pole barn. A standoff between Trotter and police ensued for several hours and involved the S.W.A.T. team from the Noblesville Police Department. Trotter eventually surrendered.

The State charged Trotter with class D felony pointing a firearm and class D felony criminal recklessness. On June 19, 2009, Trotter filed a motion to suppress evidence arguing that the officers' warrantless entry into the private residence was unlawful pursuant to the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Following an evidentiary hearing, the trial court granted Trotter's motion to suppress, excluding evidence obtained as a result of the police officers' observations upon unlawfully entering the private residence.[1] On July 28, 2009, the State filed a motion to clarify requesting the court to reconsider its ruling. Thereafter, on July 31, 2009, the trial court reversed its prior order and denied Trotter's motion to suppress, permitting the admission of evidence of the police officers' observations. Specifically, although the trial court maintained its original conclusion that the warrantless entry into the residence was unconstitutional, the trial court determined that suppression of the evidence was not necessary based upon the doctrine of attenuation. Upon Trotter's request, the trial court certified the interlocutory order for appeal, and this Court accepted jurisdiction pursuant to Indiana Appellate Rule 14(B) on November 23, 2009.

### Discussion and Decision

In ruling on Trotter's motion to suppress, the trial court concluded that the officers' warrantless entry indeed violated both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Upon the State's motion to clarify, the trial court decided that, despite the constitutional violations, evidence of the officers' observations would be admissible pursuant to the attenuation doctrine exception to the exclusionary rule. The State cross-appeals the trial court's initial determination that the entry was unlawful.

On appeal of the trial court's decision here, we are faced with two appellate standards of review. With regard to the trial court's denial of Trotter's motion to suppress, our review is somewhat similar to that used upon review of a claim of insufficient evidence; we do not reweigh

---

1. We note that although Trotter did not own the residence, he was living in the residence, and the State concedes that he had a reasonable expectation of privacy in the premises. The trial court ruled that any evidence obtained from a subsequent search of the residence pursuant to a signed consent to search by the owner of the property, Kent J. Kirby, is admissible, and Trotter does not appeal that ruling. However, it appears that the only incriminating evidence obtained in this case was that evidence obtained upon initial entry into the home, which was the officers' observations of Trotter's alleged behavior resulting in charges of pointing a firearm and criminal recklessness.

the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Crabtree v. State,* 762 N.E.2d 241, 244 (Ind.Ct.App.2002). However, unlike other sufficiency matters, we must also consider the uncontested evidence most favorable to the defendant. *J.B. v. State,* 868 N.E.2d 1197, 1200 (Ind.Ct.App.2007), *trans. denied.* With regard to the constitutionality of the warrantless entry, because the State bore the burden of proof on that issue, the State appeals a negative judgment and must show that the trial court's determination was contrary to law. *State v. Holley,* 899 N.E.2d 31, 33 (Ind.Ct.App.2008), *trans. denied.* We will reverse the trial court's decision only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id.* Before we reach the trial court's ultimate determination that the evidence is admissible, we must first address the threshold question regarding the reasonableness of the warrantless entry pursuant to federal and state constitutional provisions.

## I. Unlawful Entry

### A. Fourth Amendment

 The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings. *Taylor v. State,* 842 N.E.2d 327, 330 (Ind.2006) (citing *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). The principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment and, therefore, searches and seizures inside a home without a warrant are presumptively unreasonable. *Alspach v. State,* 755 N.E.2d 209, 212 (Ind.Ct.App. 2001), *trans. denied.* The State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement. *Taylor,* 842 N.E.2d at 330. Whether a particular warrantless search violates the guarantees of the Fourth Amendment depends on the facts and circumstances of each case. *Rush v. State,* 881 N.E.2d 46, 50 (Ind.Ct.App.2008).

 The existence of exigent circumstances falls within an exception to the warrant requirement. *Holder v. State,* 847 N.E.2d 930, 936 (Ind.2006). In other words, the warrant requirement becomes inapplicable when the " 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 936–37 (quoting *Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). Under the exigent circumstances exception, police may enter a residence without a warrant if the situation suggests a reasonable belief that someone inside the residence is in need of aid. *Smock v. State,* 766 N.E.2d 401, 404 (Ind.Ct.App.2002). However, an officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless entry. *Cudworth v. State,* 818 N.E.2d 133, 137 (Ind.Ct.App. 2004) (citations omitted), *trans. denied.* Rather, the test is objective, and the government must establish that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house required immediate assistance. *Id.* Moreover, "while exigent circumstances justify dispensing with a search warrant, they do not eliminate the need for probable cause." *Id.* The probable cause element may be satisfied where the officers reasonably believe that a person is in danger. *Id.* "The burden is on the government to demonstrate exigent circumstances that overcome the presump-

tion of unreasonableness that attaches to all warrantless home entries." *McDermott v. State*, 877 N.E.2d 467, 474 (Ind.Ct. App.2007), *trans. denied*.

■ Here, the State argues that officers were performing their "community-caretaker" function and entered the private residence to determine if Trotter had been injured or was in need of assistance. Appellee's Br. at 11–12. However, the record offers no support for the State's contention. Officers arrived on the scene to investigate what was at most an ordinance violation. Officers spoke with Dircks and were informed that a second individual, Trotter, was inside the house using the bathroom. At no time did the officers inquire about Trotter's well-being, nor did Dircks suggest that Trotter was injured or in need of aid. Although Officer Butterfield testified that he was concerned that Trotter could be intoxicated and passed out inside the residence, there was no evidence that Trotter had consumed any alcohol, much less evidence indicating that he was so heavily intoxicated that he needed immediate assistance. These police officers were not confronted with circumstances that would lead to a reasonable belief that Trotter was in need of emergency assistance.

The State emphasizes the scant evidence available to the officers that an unaccounted-for firearm remained on the premises. While perhaps indicating a possible unsafe situation, such evidence does not establish an exigency sufficient to justify a warrantless intrusion into a residence. We agree with the trial court that the evidence does not support a reasonable belief that Trotter was injured or in need of assistance at the time the officers entered the residence. The trial court properly determined that the officers' warrantless entry into the residence was neither justified by exigent circumstances nor supported by probable cause. Accordingly, the officers' warrantless entry violated the Fourth Amendment.

### B. Article 1, Section 11

■ Similarly, we agree with the trial court that the officers' warrantless entry also violated Trotter's rights pursuant to our state constitution. The purpose of Article 1, Section 11 of the Indiana Constitution is "to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." *Brown v. State*, 653 N.E.2d 77, 79 (Ind.1995). Our state provision tracks the language of the Fourth Amendment to the United States Constitution verbatim. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005). However, the legality of a governmental intrusion under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Id.* Although there may be other relevant considerations under the circumstances, the reasonableness of a search or seizure turns on a balancing of the following: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs. *Id.* at 361. Again, the burden is on the State to show that under the totality of the circumstances, the police intrusion was reasonable. *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind.2002).

■ The officers' degree of concern, suspicion, or knowledge that a violation had occurred in the instant case was essentially non-existent. As we noted above, officers arrived on the scene to investigate a possible ordinance violation. The officers expressed no suspicion or knowledge that Trotter was violating the law inside the residence or that a criminal violation had indeed occurred outside the residence

prior to their arrival. The degree of intrusion, however, was immense. Officers entered a structure that was attached to a private residence. It is well established that "[h]ouses and premises of citizens receive the highest protection" under our constitution. *Moran v. State,* 644 N.E.2d 536, 540 (Ind.1994). Further, the extent of the law enforcement needs was extremely low. Officers had no legitimate concern for Trotter's well-being as there was no evidence of exigent circumstances indicating that Trotter was injured and in need of immediate aid. As recognized by the trial court, the officers made no effort to contact Trotter by any means other than direct intrusion into the dwelling. The State has not met its burden to show, under the totality of the circumstances, that the entry was reasonable. The warrantless entry violated Article 1, Section 11 of the Indiana Constitution.

## II. Attenuation

■ Although the remedy for unconstitutional intrusion is generally suppression of the evidence obtained, the State maintains that even assuming the illegality of the officers' warrantless entry into the residence, the exclusionary rule should not apply here to suppress evidence of the officers' observations. Specifically, the State argues that Trotter's alleged act of pointing a firearm at officers in response to the unlawful entry was an intervening act that dissipated any taint of the unconstitutional entry. We must disagree.

■ The exclusionary rule is a judicially created remedy designed to safeguard the right of the people to be free from "unreasonable searches and seizures." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The main purpose of the exclusionary rule "is to deter future unlawful police conduct" and, thus, evidence obtained through an illegal search and seizure is inadmissible at trial. *See id.* at 347, 94 S.Ct. 613. However, not all evidence is fruit of the poisonous tree and subject to suppression simply because it would not have come to light but for illegal police activity. *Wong Sun v. U.S.,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Fourth Amendment jurisprudence has recognized an exception to the exclusionary rule in cases where the connection between the illegal police conduct and the subsequent discovery of evidence "become[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois,* 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring). Specifically, "[i]n some situations, the causal chain is sufficiently attenuated to dissipate any taint of [the illegal police activity], allowing the evidence seized during a search to be admitted." *Cole v. State,* 878 N.E.2d 882, 887 (Ind.Ct.App.2007). This is known as the attenuation doctrine. *See Quinn v. State,* 792 N.E.2d 597, 601 (Ind.Ct.App.2003) (citing *Brown,* 422 U.S. 590, 603–04, 95 S.Ct. 2254), *trans. denied.*

In *Webster v. State,* 908 N.E.2d 289, 293 (Ind.Ct.App.2009), *trans. denied,* another panel of this Court questioned, without affirmatively deciding, whether the attenuation doctrine exception to the exclusionary rule has any application under the Indiana Constitution. Although the Indiana exclusionary rule has historical ties to the federal rule, it was independently founded upon Article 1, Sections 11 and 14 of the Indiana Constitution. *See Callender v. State,* 193 Ind. 91, 96, 138 N.E. 817, 818–19 (Ind.1923). In *Webster,* we surmised that "a defendant's actions during a police encounter are considered as part of the totality of the circumstances in determining whether the police acted reasonably." *Id.* We noted that our supreme

court has declared that the "[f]ocus of the exclusionary rule under the Indiana Constitution is the reasonableness of the police conduct." *Id.* (*quoting Hardister v. State,* 849 N.E.2d 563, 573 (Ind.2006)). We further acknowledged that regarding the exclusion or admission of evidence the court has stated that "[a]dmissibility is lawful if the court can declare the process reasonable." *Id.* (quoting *Brown,* 653 N.E.2d at 79).

 Recently, our supreme court reiterated Indiana's unique commitment to protecting personal rights, stating that because our jurisprudence focuses on what is "reasonable" under the "totality of the circumstances," Article 1, Section 11 in some cases confers greater protections to individual rights than the Fourth Amendment affords. *Shotts v. State,* 925 N.E.2d 719, 726 (Ind.2010). Along those lines, and in agreement with the reasoning in *Webster,* we conclude that the attenuation doctrine as it currently exists as a separate analysis to circumvent the exclusionary rule for Fourth Amendment purposes has no application under the Indiana Constitution.[2] We have already determined pursuant to the *Litchfield* factors that the police officers in this case acted unreasonably under the totality of the circumstances when they entered Trotter's residence with no warrant, no probable cause, and no exigency. We further conclude that Trotter's alleged act of pointing a firearm was a direct response to the police misconduct, and in no way does Trotter's behavior make the police misconduct any more reasonable. While the trial court made much of the fact that Trotter had other options in responding to the police entry, we will not hold Trotter to a higher standard of reasonableness than the trained professionals who unlawfully invaded his residence in the night.[3] Under a totality of the circumstances analysis, the unreasonable police conduct violated Trotter's Indiana constitutional rights, and therefore suppression of the evidence of the officers' observations is warranted. The exclusionary rule is calculated to discourage police misconduct, and application of the rule here serves this deterrent function.

2. The vitality of the exclusionary rule under the Fourth Amendment has been called into question by the United States Supreme Court. *See Herring v. U.S.,* —— U.S. ——, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009) (recognizing that the U.S. Supreme Court has repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation). However, our supreme court continues to recognize that the Indiana Constitution is liberally construed in favor of protection for individuals from unreasonable intrusions on privacy. *See Shotts,* 925 N.E.2d at 726. Thus, application of an attenuation doctrine separate from a determination of reasonableness under the totality of the circumstances would diminish the safeguards historically recognized pursuant to Article 1, Section 11 of the Indiana Constitution. We believe that our supreme court embraces the full strength and purpose of the exclusionary rule and would therefore decline to adopt a separate attenuation analysis.

3. When considering the sufficiency of the evidence of a conviction for resisting law enforcement, we have noted that Indiana law recognizes the right to reasonably resist the unlawful entry of a police officer into a person's home. *See, e.g., Alspach,* 755 N.E.2d at 211. Here, Trotter was not charged with resisting law enforcement, and we need not determine whether Trotter's alleged act of pointing a firearm would constitute "reasonable" resistance in the context of a resisting conviction. Instead, upon interlocutory review of a motion to suppress, to determine the propriety of the police conduct at issue and, thus, the admissibility of evidence obtained, we view the reasonableness of Trotter's behavior as part of the totality of the circumstances and in light of the excessive and unreasonable police behavior that caused it. *See Webster,* 908 N.E.2d at 293.

▮▮▮▮▮ Although we hold that the attenuation doctrine has no application under the Indiana Constitution, even if we were to consider the doctrine, we do not believe that it would apply in this case. Both the State and the trial court rely on our decision in *Cole*, 878 N.E.2d 882, to support application of the attenuation doctrine to the facts here. The court in *Cole* addressed the Fourth Amendment; however, we presume that if we were to recognize the attenuation doctrine under Article 1, Section 11, we would likely mirror the federal analysis. In determining whether the attenuation doctrine applies, three factors are considered: " '(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.' " *Cole*, 878 N.E.2d at 887 (quoting *Quinn*, 792 N.E.2d at 600) (citation omitted). "The important consideration in the third factor is whether the evidence came from the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.*

▮▮▮ Regarding the first factor enunciated in *Cole*, the time that elapsed between the illegal entry and the officers' alleged observations of Trotter pointing a firearm was not significant. Regarding the second factor, we disagree with the trial court's conclusion that Trotter's alleged act of pointing a firearm constituted an intervening circumstance. Indeed, the facts of *Cole* with regard to this factor are distinguishable from the instant case. In *Cole*, the defendant was subjected to an unconstitutional investigatory stop and then engaged police in a foot chase, was grabbed by an officer, broke free, and then continued to run through backyards and alleys until he was finally apprehended. *Id.* at 884. After the defendant was arrested for resisting law enforcement, a search of the defendant's person revealed a handgun. The defendant argued that suppression of the handgun was warranted but we concluded that his crimes of resisting law enforcement were intervening acts that "completely purged the taint" from the unlawful investigatory stop. *Id.* at 888. Here, the evidence in question—the officers' observations—was obtained almost simultaneously with the unlawful entry. Trotter's alleged act of pointing a firearm was merely a response to the police misconduct, had a direct and immediate causal connection to the misconduct, and clearly was not an independent intervening circumstance. A person has the right to point a firearm at an intruder in his residence until he is able to confirm the intruder's identity and purpose, even during a warrantless intrusion in the middle of the night by persons claiming to be police officers. In sum, nothing occurred between the illegal entry and the officers' observations to break the causal chain.

Regarding the third factor, we agree with the trial court that the record does not suggest that the officers' unlawful entry was flagrant misconduct. Still, although officers may not have expected Trotter to respond as he did, it is clear that the entry was made without probable cause and at the expense of Trotter's protected rights. We cannot conclude that the officers' observations were obtained by means "sufficiently distinguishable from their misconduct to be purged of the primary taint." *Id.* at 887. In sum, we find no attenuation at all, much less sufficient causal attenuation so as to dissipate the taint of the unconstitutional entry. If the officers' observations of Trotter's alleged act of pointing a firearm is not fruit of the poisonous tree, then nothing is.

The proper remedy for the constitutional violation here is the suppression of the evidence obtained as a result of that violation. We reverse the trial court's denial of Trotter's motion to suppress and the trial court's grant of the State's motion to clarify, and we remand for additional proceedings consistent with this opinion.

Reversed and remanded.

FRIEDLANDER, J., and BARNES, J., concur.