**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**BROOKE N. RUSSELL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TERRY WADE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 36A01-1203-CR-85 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JACKSON CIRCUIT COURT
The Honorable William E. Vance, Judge
Cause No. 36C01-1104-MR-2

**November 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

In this interlocutory appeal, Terry Wade challenges the denial of his motion to suppress evidence obtained as the result of a warrantless entry into his home. Wade presents the following consolidated and restated issue for review: Did the trial court err in denying the motion to suppress?

We affirm.

Sisters, Vickie Wade, Michelle Hallet, and Crystal Hubbard, were actively communicating via phone and text on April 20, 2011, regarding their mother's recent hospitalization for a serious medical condition. Crystal and Vickie spent time together with their mother in the hospital that evening, and Vickie made plans to return on her day off the next day to help her mother. Later that evening, Vickie had a phone conversation with Michelle and agreed to take Michelle with her to the hospital the next day. The last communication either of the sisters received from Vickie was a missed phone call to Crystal's cell phone at 10:12 p.m. on April 20. Crystal did not see the missed call until the following morning, and she went to work without calling back because she felt it was too early to call.

Crystal sent Vickie a text regarding their mother around 10:00 a.m. and received no response. Crystal visited her mother at the hospital on her lunch hour and then again around 5:00 p.m. Crystal became concerned when she learned that Vickie had not been to the hospital at all that day. As a result, Crystal texted Michelle and asked her to check on Vickie because she was worried. After texting and calling both Vickie's cell and home phone several times with no response, Michelle went to the house where Vickie lived with her husband, Wade. There was no answer at the door. At Crystal's behest, Michelle drove to

2

another residence to call police.

Just before 7:00 p.m., Jack Hauer of the Seymour Police Department responded to the request for a welfare check at the Wade home.[1] Hauer knocked at the front and back door of the residence, but no one answered and all seemed quiet inside. He noticed that there was mail in the mailbox, the newspaper was still there, two cars were parked in front of the house, and the window air conditioner was on, which was unusual given the outside temperature.

After walking around the house again, Hauer called Michelle to obtain more information. Michelle informed him that their mother was in the hospital dying and that the three sisters had been maintaining close contact regarding their mother up until about 10:30 the night before. Michelle further informed Hauer that she and Crystal had since tried several times to contact Vickie without success, including going over to her house. Hauer asked Michelle to come back over to the house.

While waiting for Michelle, Hauer and another officer spoke with three neighbors. The neighbors had not seen the Wades that day, though an unknown man had mowed their grass that afternoon. Michelle and Crystal arrived shortly thereafter and spoke further with the officers. The sisters reiterated their concerns and indicated that it was "totally out of character not being able to contact their sister." *Transcript* at 112. Hauer asked if their sister and her husband could just be out of the house, but the sisters did not believe so and directed

---

[1] Hauer knew the three sisters through their dad as they were growing up, but he had not had contact with them in years.

3

Hauer to both of the Wades' cars out front.

Hauer informed the sisters that he would not force entry into the house and suggested that they just wait and see if the Wades came home. By this point, however, Michelle had gotten very emotional and even "tremble[d] once in a while." *Id*. at 113. Crystal was also concerned, as she "just knew in [her] heart that something was wrong." *Id*. at 30. Hauer realized that Michelle and Crystal were not going to leave until they checked inside the house for their sister.

Hauer discussed several options with the sisters and indicated that he would stand by if they wanted to try to get in.[2] After failed attempts at entering the house without breaking the door down, Crystal decided to call a locksmith. Hauer assisted in locating phone numbers for her, but he advised that contacting a locksmith would be the sisters' decision and that they would be responsible for the expense. The third locksmith that Crystal called (a referral from her father-in-law) was available.

James Hinderlider, the locksmith, arrived at the Wades' home about twenty minutes after Crystal's call. Hauer explained to Hinderlider that he was called at the sisters' request and that they were responsible for payment. After Crystal paid Hinderlider, he unlocked the door and opened it about an inch. He then returned to his vehicle.

Crystal and Michelle prepared to enter the house, but Hauer asked the women to step back first so that he could be certain that they would be safe entering the home. He then

---

[2] Officer Chadd Rogers, who was also on the scene, testified that he and Hauer were in no way encouraging the sisters to enter the home and would have left if the sisters had not been so adamant about getting inside to check on their sister.

reached across the threshold and pushed the door open with his hand. The light from outside lit up the dark room, and Hauer saw a woman inside slumped over in a chair. He could see blood matted in her hair and knew something was wrong, so he stepped into the home to check on her. The woman, Vickie, had extensive head trauma and was deceased. Hauer then turned his attention to a man lying on a couch in the same room. The man, later identified as Wade, had "thick regurgitation coming down both sides of his mouth and down his neck." *Id.* at 122. Hauer believed Wade was also deceased until he heard a gurgling sound. Hauer then immediately radioed for emergency assistance.

On May 2, 2011, the State charged Wade with Vickie's murder. Wade subsequently filed a motion to suppress all evidence gathered as a result of the warrantless entry of his home. Following a hearing, the trial court summarily denied the motion to suppress on January 18, 2012. Thereafter, Wade obtained certification from the trial court for appeal of this interlocutory order, and we accepted jurisdiction on March 23, 2012.

Upon review of a denial of a motion to suppress, we determine whether the record discloses substantial evidence of probative value to support the ruling. *State v. Renzulli*, 958 N.E.2d 1143 (Ind. 2011). Like other sufficiency matters, we do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling. *Id.* In this context, however, we also consider any uncontested evidence favorable to the defendant. *Westmoreland v. State*, 965 N.E.2d 163 (Ind. Ct. App. 2012). "We review de novo a ruling on the constitutionality of a search or seizure, but we give deference to a trial court's determination of the facts". *Id.* at 165.

The Fourth Amendment to the United States Constitution and article 1, section 11 of

the Indiana Constitution protect citizens from unreasonable searches and seizures. "In spite of the similarity in structure of the federal and state constitutional provisions, interpretations and applications vary between them." *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006). Wade has alleged a violation under both the federal and state constitution; thus, we will separately review them.

"The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Montgomery v. State*, 904 N.E.2d 374, 377-78 (Ind. Ct. App. 2009), *trans. denied*. For a search to be reasonable under the Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, a warrant is required unless an exception applies. *Montgomery v. State*, 904 N.E.2d 374. One well-recognized exception is when exigent circumstances exist. *Id*.

Among the exigent circumstances that have justified a warrantless search or seizure are entries to aid a person in need of emergency assistance. *Id*. (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (police may enter a residence without a warrant "when they reasonably believe that a person within is in need of immediate aid")). *See also Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005) ("police may enter a residence if the situation suggests a reasonable belief that someone inside the residence is in need of aid"), *trans. denied*. Although exigent circumstances justify dispensing with a warrant, probable cause is still required. *Montgomery v. State*, 904 N.E.2d 374. In an emergency situation, probable cause is satisfied where the officers reasonably believe that a person is in danger. *Id*. The test, however, is objective, and the State must establish that "the circumstances as

6

they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house required immediate assistance." *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010). A person's absence, combined with other circumstances, may create such a reasonable belief. *Vitek v. State*, 750 N.E.2d 346 (Ind. 2001).

The State bears the burden of establishing exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. *Trotter v. State*, 933 N.E.2d 572. "Whether a particular warrantless search violates the guarantees of the Fourth Amendment depends on the facts and circumstances of each case." *Id*. at 579.

Wade contends that the officers could not have reasonably believed Vickie was in danger inside the house because she had been out of contact with her sisters for only a short time, it was unknown whether anyone was even inside the home, and there were no indications of foul play visible from outside the home. In sum, Wade argues: "Aside from not knowing an adult woman's whereabouts for less than twenty-four (24) hours, there was no reason to believe that Vickie, or anyone who might be in the house, was in physical danger much less in the immediate need of aid." *Appellant's Brief* at 21. We cannot agree.

Although Vickie had been out of contact for only a little less than twenty-four hours, the specific facts of this case indicate that this was entirely out of character for her. In particular, Vickie's sisters informed Hauer that they had been in close contact with her the previous day due to the fact their mother was in the hospital dying. Despite these circumstances and Vickie's close relationship with her mother, Vickie had not responded to any texts or phone calls and did not visit her mother in the hospital on the day in question.

7

The sisters were adamant that something was wrong with their sister and that they needed to check inside Vickie's home for her.

Further, although all seemed quiet inside the home that evening, there were indications that someone could very well be inside and in need of aid. Vickie and Wade's vehicles were parked outside the home, neighbors had not seen them that day despite the fact Vickie was off work, and the mail and newspaper had not been collected. The sisters also informed Hauer that they doubted Vickie and Wade had just left and were not home.

The record before us indicates that Hauer responded thoughtfully and deliberately[3] to a reliable missing person report made by two genuinely concerned family members. Crystal and Michelle's fear for their sister's safety was immediately apparent from their words, actions, and emotional responses. Moreover, the officers' own observations at the scene did not cast doubt on the sisters' concerns. "And unlike the majority of cases discussing exigent circumstances, the officers here were not motivated by intent to apprehend a suspect and/or seize incriminating evidence." *Montgomery v. State*, 904 N.E.2d at 380. Rather, they were legitimately assisting in the search for a missing person who might be in need of immediate aid.

Under the facts of this case, we conclude the State proved both exigency and an objectively reasonable belief that Vickie was in need of aid. Accordingly, Hauer's

---

[3] Wade posits a number of additional questions Hauer could have asked neighbors and the sisters and investigations he could have made before entering the home without a warrant. "We should not expect – nor should we want – officers to have to collect the kind of facts and circumstances that would rise to the level of probable cause to arrest or to procure a warrant to search for incriminating evidence before entering a place with the purpose of protecting or preserving life." *Montgomery v. State*, 904 N.E.2d at 381. In emergency situations, the business of police officers is "to act, not to speculate or meditate on whether the report is correct." *Id*. (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963), *cert. denied*).

warrantless entry into the home did not violate the Fourth Amendment.[4]

We turn now to the state constitution. The purpose of article 1, section 11 of the Indiana Constitution is "to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." *Brown v. State,* 653 N.E.2d 77, 79 (Ind. 1995). Although our state provision tracks the language of the Fourth Amendment verbatim, the legality of a governmental intrusion under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State,* 824 N.E.2d 356 (Ind. 2005); *Trotter v. State*, 933 N.E.2d 572. There may be other relevant considerations under the circumstances, but the reasonableness of a search generally turns on a balancing of the following: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs. *Trotter v. State*, 933 N.E.2d 572. "Again, the burden is on the State to show that under the totality of the circumstances, the police intrusion was reasonable." *Trotter v. State*, 933 N.E.2d at 580.

Here, Vickie's sisters expressed a great degree of concern for her wellbeing inside the house and gave Hauer specific reasons for their concern. Though Hauer and the other officer were guarded in their response, their deliberate actions during the hour-long investigation did not make the degree of concern minimal, as suggested by Wade.

---

[4] The parties focus a great deal on whether the locksmith was a state actor. We need not decide the issue because even assuming he was a state actor, the entry was not unconstitutional under the circumstances. Further, regardless of how the door became unlocked, Hauer still made a warrantless entry by pushing the door open.

9

With respect to the third factor listed above, we observe that police officers have a caretaking function as well as an investigatory function and that protecting the welfare of citizens during an emergency is a significant law enforcement need. *See Montgomery v. State*, 904 N.E.2d 374. "It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns." *Holder v. State*, 847 N.E.2d at 940. There is no dispute in this case that the actions of the officers were aimed solely at protecting and aiding Vickie and her sisters, as opposed to investigating a crime.

Finally, we acknowledge that the warrantless entry of a home is generally considered an immense intrusion. *See Trotter v. State*, 933 N.E.2d 572. "It is well established that '[h]ouses and premises of citizens receive the highest protection' under our constitution." *Id.* at 581 (quoting *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994)). In this case, however, the officers (as well as Crystal and Michelle) made attempts to contact Vickie before entering the home. Further, they did not break down the door and barge into the home. On the contrary, Hauer took minimally invasive steps to check on Vickie's safety inside the home and protect her sisters. Once the door was unlocked by the locksmith, Hauer stood at the door and simply pushed it open. At that point he observed Vickie slumped over in a chair with significant head trauma and, upon entering the home to come to her aid, encountered Wade in dire need of medical attention.

Under the totality of the circumstances, we conclude that Hauer acted reasonably in entering the Wade home. The warrantless entry, therefore, did not violate article 1, section 11 of the Indiana Constitution. The trial court properly denied Wade's motion to suppress.

Affirmed.

BROWN, J., and PYLE, J., concur.