

**FILED**

Nov 14 2016, 9:04 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bernice A. N. Corley
Marion County Public Defender Agency
Appellate Panel Attorney
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William McNeal,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | November 14, 2016<br><br>Court of Appeals Case No.<br>49A05-1604-CR-838<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Shannon L. Logsdon, Judge Pro Tempore<br><br>Trial Court Cause No.<br>49G21-1509-F5-31039 |

**Crone, Judge.**

## Case Summary

[1] William McNeal appeals his conviction for level 5 felony possession of cocaine, following a bench trial. He contends that the trial court abused its discretion in admitting evidence that he claims was obtained in violation of his rights

pursuant to the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Finding no federal or state constitutional violation, and therefore no abuse of discretion, we affirm.

## Facts and Procedural History

[2] On August 28, 2015, Indianapolis Metropolitan Police Department Officer Aaron Helton was on routine patrol near East 10th Street and Gray Road in Marion County, when he noticed a man lying face down on the sidewalk. A crowd was starting to form around the man. Officer Helton alerted dispatch that he was going to stop and perform a welfare check on the man. When Officer Helton got close to the man, who was later identified as "Kemo," he observed that Kemo was sweating and he could not tell if Kemo was breathing. Tr. at 16. Officer Helton attempted to shake Kemo to rouse him, but Kemo was unresponsive. Officer Helton immediately called for medical personnel to come to the scene.

[3] Around the same time that medics arrived, another man, later identified as McNeal, approached Officer Helton saying, "That's my bro, let's go, let's go." *Id.* at 14. Officer Helton observed that McNeal had an "[u]nsteady gait, like not really walking straight …." *Id.* McNeal was sweating profusely, his eyes were "reddish, "glassy," and "glazed over," his speech was "kind of slurred," and it appeared to Officer Helton like McNeal's heart "was beating out of his chest. He just looked like he was in dire straits medically." *Id.* at 14, 22, 31. Officer Helton asked McNeal who he was, and McNeal gave him his identification. As Kemo started to wake up, McNeal kept saying, "We got to go, let's get out of

here, let's go." *Id.* at 16. McNeal began speaking "gibberish" and things that "didn't make sense," and then he tripped and fell over Kemo. *Id.* at 16, 28-29.

[4] Believing that McNeal was also in need of medical treatment, Officer Helton advised McNeal, "Why don't you sit down, why don't you stay seated, why don't you sit down." *Id.* at 17. McNeal refused, saying, "No, I got to go, let's get out of here." *Id.* Officer Helton stated, "No, man, you look like you need some medical attention, why don't you sit down." *Id.* As McNeal tried to get up, he fell back down again. Worried about McNeal's safety and his medical condition, Officer Helton decided to handcuff McNeal because he did not believe that he would otherwise be able to "keep [McNeal] there" and seated until more medics could arrive. Indianapolis Metropolitan Police Department Officer Davey Williams arrived on the scene and observed that McNeal, who was sitting on the ground, was "kind of like leaning over" and having trouble remaining in an upright position. *Id.* at 42. Officer Williams used his legs to "prop [McNeal] up" so that he did not fall and hit his head on the sidewalk. *Id.* at 51.

[5] A second group of medics arrived. After evaluating Kemo and McNeal, the medics determined that both of them were in "bad shape" and needed to be transported to the hospital. *Id.* at 18. Before McNeal was transported, Officer Helton ran a check on his identification and discovered that he had an outstanding arrest warrant. During a subsequent search incident to arrest, Officer Helton discovered three baggies of cocaine in McNeal's front right pants pocket. McNeal was transported by ambulance to a hospital emergency room.

The State charged McNeal with level 5 felony possession of cocaine. McNeal filed a motion to suppress alleging that his detention by police was unconstitutional, and therefore all evidence subsequently obtained should be suppressed. The trial court denied the motion to suppress and held a bench trial on March 14, 2016. McNeal renewed his objection to the admission of the cocaine evidence during trial. At the conclusion of the trial, the court found McNeal guilty as charged. This appeal ensued.

## Discussion and Decision

McNeal asserts that the trial court abused its discretion in admitting the cocaine evidence at trial. "Our review of rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by trial objection." *Lundquist v. State*, 834 N.E.2d 1061, 1067 (Ind. Ct. App. 2005). "We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling." *Id.* We must also consider the uncontested evidence favorable to the defendant. *Id.* We will not disturb the trial court's evidentiary ruling unless it is shown that the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011). However, the constitutionality of a search and seizure is a question of law that we review de novo. *Lewis v. State*, 949 N.E.2d 1243, 1246 (Ind. 2011).

# Section 1 – Police did not violate McNeal's Fourth Amendment rights.

[8] We begin by addressing McNeal's contention that the cocaine evidence was obtained in violation of his Fourth Amendment rights. The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[9] "The fundamental purpose of the Fourth Amendment 'is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings.'" *Hines v. State,* 981 N.E.2d 150, 153 (Ind. Ct. App. 2013) (quoting *Trotter v. State,* 933 N.E.2d 572, 579 (Ind. Ct. App. 2010)). This protection has been extended to the states through the Fourteenth Amendment. *Krise v. State,* 746 N.E.2d 957, 961 (Ind. 2001). In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant that is supported by probable cause. *Clark v. State,* 994 N.E.2d 252, 260 (Ind. 2013). As a deterrent mechanism, evidence obtained without a warrant is not admissible in a prosecution unless the search or seizure falls into one of the well-delineated exceptions to the warrant requirement. *Id.* "Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or

seizure." *Brooks v. State,* 934 N.E.2d 1234, 1240 (Ind. Ct. App. 2010), *trans. denied* (2011).

[10] Moreover, encounters between law enforcement officers and citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do. *Clark*, 994 N.E.2d at 261. Consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. *Id.* Nonconsensual encounters do, though, and typically are viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop. *Id.* The former requires probable cause to be permissible; the latter requires a lower standard of reasonable suspicion. *Id.*[1]

[11] We note that McNeal concedes that his initial encounter with Officer Helton was consensual and did not implicate the Fourth Amendment. However, he maintains that Officer Helton's behavior converted what began as a consensual encounter into an investigative detention lacking in reasonable suspicion that he was engaged in criminal activity. Accordingly, he asserts that any evidence discovered subsequent to his unlawful detention should have been excluded as "fruit of the poisonous tree." *See Segura v. United States*, 468 U.S. 796, 804 (1984) (noting that the exclusionary rule encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and any

---

[1] Our supreme court has recognized that what begins as a consensual encounter can "evolve[] into an investigative stop." *Finger v. State*, 799 N.E.2d 528, 533 (Ind. 2003).

"evidence later discovered and found to be derivative of an illegality.") This would include the cocaine evidence obtained during the search incident to arrest that followed Officer Helton's discovery of what both parties agree was a valid pre-existing arrest warrant. *See Williams v. State*, 898 N.E.2d 400, 402 (Ind. Ct. App. 2008) (observing that search was incident to lawful arrest when officer learned of active arrest warrant during routine traffic stop), *trans. denied* (2009).

[12] The State does not dispute that McNeal's encounter with Officer Helton indeed evolved from a consensual encounter into an investigative detention. However, the State maintains that there were sufficient facts available to Officer Helton to support a reasonable suspicion that McNeal was engaged in the crime of public intoxication, and therefore his warrantless detention was lawful and did not taint the subsequent search incident to arrest that yielded the cocaine.[2] We agree with the State, but we choose to first address what we believe is the more pertinent justification for Officer Helton's detention of McNeal based upon the facts and circumstances presented, that is, Officer Helton's reasonable exercise of the community caretaking function.

---

[2] The State focuses its argument on the assertion that, at the time of the detention, Officer Helton had probable cause to arrest McNeal for public intoxication. We decline to address that argument because we conclude that Officer Helton's conduct was more akin to an investigative detention that required the lower standard of reasonable suspicion.

# Section 1.1 – Officer Helton's detention of McNeal was reasonable pursuant to the community caretaking function.

[13] One exception to the warrant requirement is when police are exercising their "community caretaking function." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). In *Cady*, the United States Supreme Court acknowledged the multifaceted nature of policing in articulating this now well-known exception to the warrant requirement. *Id*. The exception recognizes that "[t]he police are expected not only to enforce the criminal laws but also to aid those in distress, abate hazards, prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of communities." *Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993). The community caretaking function has been described as "'a catchall for the wide range of responsibilities that police officers must discharge from their criminal enforcement activities.'" *Id*. (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir. 1991), *cert. denied* (1992)). The community caretaking function is a narrow exception to the privacy protections of the Fourth Amendment so as to ensure that the exception "is not improperly used to justify, after the fact, warrantless investigative foray." *Colorado v. Bertine*, 479 U.S. 367, 381 (1987) (Marshall, J., dissenting).

[14] Recently, other panels of this Court have noted that this exception to the warrant requirement has been applied, in Indiana, only to justify inventory searches of impounded vehicles. *See Cruz-Salazar v. State*, No. 49A05-1511-CR-1782, 2016 WL 3551529, at *3 (Ind. Ct. App. June 30, 2016), *trans. pending*;

*Osbourne v. State*, 54 N.E.3d 428, 434 (Ind. Ct. App. 2016), *trans. granted*. Observing that numerous other state courts have adopted the community caretaking function as an exception to the Fourth Amendment warrant requirement in various situations beyond inventory searches of vehicles, those panels each adopted, as do we, a three-pronged analysis for evaluating claims of police community caretaking functions as set out by the Wisconsin Supreme Court in *State v. Kramer*, 759 N.W.2d 598, 605 (Wis. 2009). *Id.*

[15] Before reiterating and applying the Wisconsin analysis, we emphasize that although prior Indiana courts have either not had occasion or not been inclined to extend the community caretaking exception beyond inventory searches of impounded vehicles, and most recently have extended the community caretaking exception only to cases in which a vehicle is involved in some way, *see id.*, we see no discernible rational basis for limiting the application of the community caretaking function in such a manner. We understand that vehicle impoundments fall under the community caretaking function because "[c]ommunity safety often requires police to impound vehicles because they are abandoned and obstruct traffic, create a nuisance, or invite thieves and vandals." *Wilford v. State*, 50 N.E.3d 371, 375 (Ind. 2016). We also understand that vehicles themselves can be dangerous instrumentalities, and that the involvement of a vehicle in most scenarios will elevate the level of potential hazards that police are attempting to abate by exercising their community caretaking function. Nevertheless, it would be illogical to think that a police officer cannot aid a citizen in distress, abate hazards, or perform the "infinite

variety of other tasks calculated to enhance and maintain the safety of communities," *Fair*, 627 N.E.2d at 431, simply because a vehicle is not involved. Accordingly, we reject McNeal's suggestion that the community caretaking exception is inapplicable in the present case due to the absence of a vehicle. With this in mind, we turn to assess Officer Helton's execution of the community caretaking function pursuant to the Wisconsin approach.

[16] In assessing whether the community caretaking function justifies the warrantless seizure of a person, the trial court must determine: "(1) that a seizure within the meaning of the [F]ourth [A]mendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual." *Kramer*, 759 N.W.2d at 605. During the second step—i.e., whether the police conduct was bona fide community caretaker activity—"a court considers whether police conduct is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id*. at 606 (quoting *Cady*, 413 U.S. at 441). This determination is based on an examination of the totality of the circumstances as they existed at the time of the police officer's conduct. *Id*. at 608. While a police officer's subjective intent may be a factor to consider in the totality of the circumstances, when "an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.* The third step—the balance of public needs against individual privacy interests—assesses whether the officer's

exercise of his or her community caretaker function was reasonable. *Id*. at 610. "The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable." *Id*. at 611. In balancing these interests, the court considers: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, and the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility, and effectiveness of alternatives to the type of intrusion actually accomplished. *Id*.

[17]    In the present case, there is no dispute that Officer Helton seized McNeal within the meaning of the Fourth Amendment when he handcuffed him and had him remain seated on the sidewalk while waiting for medics to arrive. Turning to the second prong, Officer Helton articulated an objectively reasonable basis for detaining McNeal that was wholly unrelated to any criminal investigative duties. Officer Helton testified that he detained McNeal out of concern for his safety. In addition to McNeal appearing to be in "dire straits medically," Tr. at 14, he had already fallen on the sidewalk twice, one time falling over Kemo. The objective facts that existed at the time of the detention indicated that McNeal was endangering himself and others. Moreover, Officer Helton's subjective belief matched the objectively reasonable basis for detaining McNeal. Officer Helton testified that he believed that McNeal was in need of medical assistance, and the officer denied that he was investigating McNeal for any criminal activity. *Id*. at 31. Based upon these

facts, we conclude that Officer Helton was engaged in a bona fide community caretaking function.

[18]    In determining whether Officer Helton's conduct was reasonable under the third prong of the analysis, we balance the public interest or need that was furthered by Officer Helton's conduct against the degree and nature of the restriction upon McNeal's liberty interests. The public interest in assuring that police render aid to a citizen who appears to be in severe medical distress and in need of immediate care, and who voluntarily and literally stumbles upon the officer and engages his attention, is incredibly high. Officer Helton was already performing his community caretaking function in checking the welfare of Kemo, who was lying face down on a public sidewalk, when McNeal interrupted and interfered, bringing his own apparent medical distress to light. Officer Helton did not exercise any overt authority over McNeal until McNeal had already fallen twice, and the officer's requests for McNeal to stay seated for his own safety, and the safety of others, went unheeded. No vehicle was involved here, so that factor is irrelevant. Regarding the availability, feasibility, and effectiveness of alternatives to the type of intrusion actually accomplished, the facts indicate that handcuffing McNeal until medics could arrive was the most feasible, effective, and least intrusive means for Officer Helton to secure McNeal's safety and to prevent additional potential hazards from materializing.

[19]    After balancing the interests involved, we conclude that Officer Helton's conduct was reasonable under the circumstances. Accordingly, because Officer Helton's conduct was a reasonable exercise of the community caretaking

function, his detention of McNeal did not violate McNeal's Fourth Amendment rights.

## Section 1.2 – Officer Helton had reasonable suspicion to detain McNeal.

[20] Aside from the community caretaking function, the State maintains that Officer Helton's detention of McNeal was supported by reasonable suspicion that McNeal had committed, or was about to commit, the crime of public intoxication. Indiana Code Section 7.5-5-1-3(a) provides in relevant part that it is a class B misdemeanor for a person to be in a public place in a state of intoxication caused by the person's use of alcohol or a controlled substance, if the person: "(1) endangers the person's life; (2) endangers the life of another person; (3) breaches the peace or is in imminent danger of breaching the peace; or (4) harasses, annoys, or alarms another person." Moreover, it is well settled that

> an officer may conduct a brief investigatory stop of an individual when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. The investigatory stop, also known as a *Terry* stop, is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions. Reasonable suspicion is determined on a case by case basis. The reasonable suspicion requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur.

*J.B. v. State,* 30 N.E.3d 51, 55 (Ind. Ct. App. 2015) (citations and quotation marks omitted).

[21] Here, as Officer Helton was in the midst of conducting a welfare check on Kemo, McNeal voluntarily walked up and interrupted. Officer Helton observed that McNeal had an "[u]nsteady gait, like not really walking straight" and was sweating profusely, his eyes were "reddish, "glassy," and "glazed over," and his speech was "kind of slurred." Tr. at 14, 22, 31. McNeal got very close to Officer Helton and was speaking "gibberish" and things that just "didn't make sense." *Id* at. 28-29. McNeal then tripped and fell over Kemo. After "trying to get back up," he "fell down again," and continually refused Officer Helton's suggestions to just "sit down" so as not to hurt himself or someone else. *Id*. at 17. Based upon the facts available to Officer Helton at the time of the detention, an ordinarily prudent person in his position could reasonably infer that McNeal had committed, or was about to commit, the crime of public intoxication.

[22] While McNeal points out that Officer Helton testified that he was concerned solely with McNeal's medical condition and safety and that the officer specifically denied investigating McNeal for public intoxication, Officer Helton's subjective beliefs and motivations are not relevant to our Fourth Amendment analysis. It is well settled that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively,* justify [the] action. The officer's

subjective motivation is irrelevant." *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404 (2006) (citations and quotation marks omitted).

[23] Under the facts and circumstances presented, viewed objectively, we conclude that the facts known to Officer Helton together with the reasonable inferences arising from such facts would cause an ordinarily prudent person to believe that criminal activity may be afoot, thus justifying a brief investigatory detention. The detention was not a violation of McNeal's Fourth Amendment rights.

## Section 2 – Police did not violate McNeal's rights under the Indiana Constitution.

[24] McNeal also asserts that Officer Helton's conduct violated Article 1, Section 11 of the Indiana Constitution. While the language of Article 1, Section 11 is virtually identical to its Fourth Amendment counterpart, our supreme court has "made an explicit point to interpret and apply Section 11 independently from federal Fourth Amendment jurisprudence." *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001). Under Article 1, Section 11, the State must show that, in the totality of the circumstances of a detention without a warrant, the police behavior was reasonable. *J.J. v. State*, 58 N.E.3d 1002, 1005 (Ind. Ct. App. 2016).

[25] For the same reasons explained in the context of the Fourth Amendment, we hold that Officer Helton's detention of McNeal did not violate the Indiana Constitution. Under the totality of the circumstances, whether based upon the community caretaking function or reasonable suspicion of criminal activity,

Officer Helton's detention of McNeal was eminently reasonable. Accordingly, we cannot say that the cocaine evidence discovered subsequently was derivative of any illegality. Therefore, we conclude that the trial court did not abuse its discretion in admitting the evidence, and we affirm McNeal's conviction.

Affirmed.

Kirsch, J., and May, J., concur.